**AFFIDAVIT OF SPECIAL AGENT RONALD MULLET<br>IN SUPPORT OF CRIMINAL COMPLAINT**

I, Special Agent Ronald Mullett, being duly sworn, depose and state as follows:

1. I have been employed as a Special Agent with the United States Department of Treasury, Internal Revenue Service, Criminal Investigation ("IRS-CI"), since 2008. Before becoming a Special Agent, I worked for IRS-CI as a contract criminal intelligence analyst from 2003 through 2008. I graduated from the Federal Law Enforcement Training Center's Criminal Investigator Training Program in March 2009 and the IRS-CI Training Academy in June 2009. I am currently assigned to the Boston, Massachusetts IRS-CI field office, where I am responsible for investigating, among other crimes, tax evasion, money laundering and violations of the Bank Secrecy Act. During my tenure with IRS-CI, I have gained extensive experience in tax fraud and other financial investigations.

2. I submit this affidavit in support of a criminal complaint charging CARLOS RAFAEL and DEBRA MESSIER with

   a. Making false entries in records with the intention of impeding and influencing the proper administration of matters within the jurisdiction of the National Oceanic and Atmospheric Administration ("NOAA") and other federal agencies, and aiding and abetting that offense, in violation of 18 U.S.C. §§ 1519 & 2; and

   b. Conspiring to commit the above offense, in violation of 18 U.S.C. § 371.

3. Section 1519 of Title 18 of the United States Code prohibits, among other things, "knowingly . . . mak[ing] a false entry in any record [or] document, . . . with the intent to impede, obstruct or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States[.]"

1

4.      NOAA is a federal scientific agency within the U.S. Department of Commerce which, among other things, regulates the use and protection of ocean and coastal resources. The National Marine Fisheries Service ("NMFS") is a division within NOAA. NMFS is responsible for the stewardship and management of U.S. living marine resources and their habitat within the United States' Exclusive Economic Zone, an area extending seaward 200 nautical miles from the coastline.

5.      I have personally participated in the investigation underlying this application for a criminal complaint. I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports by other law enforcement officers. Because this affidavit is being submitted for the limited purpose of supporting an application for a complaint, I have not included every detail of the investigation.

6.      Overall, based on the investigation to date, it appears that CARLOS RAFAEL, with the assistance of DEBRA MESSIER, is engaged in unlawful activities involving the interstate transportation of illegally caught fish species (16 U.S.C. §§ 3371-74), making false statements on federal forms (18 U.S.C. §§ 1519 & 1001), and mail and wire fraud (18 U.S.C. §§ 1341 & 1343). RAFAEL then launders the proceeds of those unlawful activities by smuggling cash out of the United States and concealing it in Portuguese bank accounts, in violation of 18 U.S.C. § 1956(a)(2)(B).

7.      As discussed further below, fishing vessels owned by corporate shells controlled by RAFAEL catch certain species of fish subject to strict federal quotas, but RAFAEL falsifies federally-mandated forms to misrepresent that catch as other species subject to more lenient quotas. He then submits the forms to the federal government by mail or by interstate wire transmission, depending on the form. As to the catch itself, RAFAEL sells it for cash to a

wholesaler in New York City, transporting the fish to New York by truck on a daily basis. The New York wholesaler, in turn, pays for the fish in installments by transporting bags of cash to RAFAEL in Massachusetts or at a pre-arranged location in Connecticut. As discussed further below, RAFAEL then launders at least a portion of those proceeds by (a) transferring it through Logan International Airport in a way that evades security screening (and so federal currency reporting requirements) and (b) concealing the proceeds in overseas accounts.

## GENERAL ALLEGATIONS CONCERNING COMMERCIAL FISHING

8. Commercial fishing is a highly regulated industry. Operators of fishing vessels must comply with various restrictions on fishing areas, seasonal access, gear usage, and limits on the quantity or weight of fish caught, that is, species quotas. To ensure a sustainable fishery for a particular species, NOAA, implementing its mandate under the Manguson-Stevens Fishery Conservation and Management Act, has authority to set quotas and catch limits for commercial fishing vessels operating out of ports in the United States, *e.g.*, New Bedford, Massachusetts.

9. Because it is nearly impossible to monitor what fishing vessels do out at sea, commercial fishing vessels are required to comply with various reporting requirements. One of these is that vessels must complete a Fishing Vessel Trip Report ("trip report") at the end of each fishing trip. *See* 50 C.F.R. § 648.7(b)(1)(i). The trip report requires, among other things, that the vessel report all species caught and the weight of each catch. Vessel captains sign trip reports under penalty of perjury, and are required to mail the reports to NOAA. *See id*. § 648.7(f)(2).

10. Federally permitted commercial fishing vessels must only sell their catch to federal fish dealers. *See id*. § 648.14(c). Under the federal regulatory scheme, it is possible for a person to own both a corporate entity that is an authorized dealer and also own federally permitted fishing vessels.

11. NOAA requires all dealers to submit, on a weekly basis, electronic reports ("dealer reports") detailing information about the fish they buy (usually from incoming vessels). To submit reports, the dealer must log onto a NOAA website and enter the data. *See id*. §§ 648.7(a)(1), 648.7(f). Dealer reports include data about the date a catch was landed, the name of the vessel that brought it in, the grade, species, price and weight of the fish, and the number of the trip report that corresponds to the catch.

12. NOAA uses the dealer reports as a check on the information vessels submit on trip reports. In a given instance, if the species and weight listed on the dealer report do not match the corresponding trip report, the discrepancy may be evidence of fraud on one or both reports. Therefore, to perpetrate an ongoing fraud regarding the weight or species of a given catch, the vessel operator and the dealer must collude. This is easier when the vessel and the dealer are owned by the same person, here CARLOS RAFAEL.

## FACTUAL ALLEGATIONS SUPPORTING CHARGES

### I. The Undercover Investigation of CARLOS RAFAEL

13. RAFAEL, who is a U.S. citizen born in Portugal and now living in New Bedford, Massachusetts, owns over 40 fishing vessels ported in New Bedford and Gloucester, Massachusetts. RAFAEL's also owns Carlos Seafood, Inc., a business also based in New Bedford. Based on Carlos Seafood's corporate tax returns, RAFAEL is the 100% shareholder in the business. Overall, RAFAEL runs one of the largest commercial fishing operations in the United States.

14. Over the last twenty years, RAFAEL has been the subject of several federal criminal investigations. He has been previously prosecuted three times for federal offenses,

including tax evasion (1980s – convicted), price-fixing (1994 – acquitted), and false statements on landing slips for commercial fishing vessels (2000 – convicted).

> A. **RAFAEL's Interactions with Undercover Agents Posing as Potential Buyers of his Fishing Business**

15. On January 4, 2015, an article appeared in the *South Coast Today* newspaper about RAFAEL's efforts to sell his commercial fishing business. On May 22, 2015, an undercover agent ("UC") working for the IRS contacted RAFAEL to ask whether he was still interested in selling some or all of his business. RAFAEL said he was looking to sell "the whole enchilada," including all fishing vessels and Carlos Seafood, Inc. RAFAEL agreed to meet with the UC and the UC's colleagues (collectively "UCs"), and invited them to his offices in New Bedford.

16. RAFAEL met with the UCs on June 3, 2015, at his office. Starting with that meeting, RAFAEL began describing his fishing business to the UCs, including several illegal aspects of the enterprise. The UCs, who were posing as a broker and two Russian immigrants already involved in organized crime, recorded the conversations.

17. During the June 3 meeting, RAFAEL discussed his disdain for the IRS and most other government agencies, and recalled being incarcerated for tax evasion in the 1980's. He offered to sell his entire fishing operation to the UCs for $175,000,000.

18. RAFAEL then showed the UCs financial statements for Carlos Seafood for the tax years 2011 through 2013 and a draft financial for tax year 2014. The financials showed that, in each of these years, RAFAEL had reported only between $3,000,000 and $4,000,000 in adjusted gross income. According to the draft 2014 financial statement, RAFAEL's businesses had combined assets of about $21,000,000.

19. Based on the reported income and the value of the assets listed in the financial statements, the UCs asked how RAFAEL could justify valuing his business at the much higher figure of $175,000,000. In response, RAFAEL retrieved what appeared to be a ledger, labeled "Cash," from his desk and said, "We are profitable. You will not see it on paper for Carlos Seafood." Then, while tapping his finger on the paper, RAFAEL said, "You see this? I did this for six months. This would have been another $600,000 in my bottom line. I show a $445,000 loss for the year." Referring again to the ledger, RAFAEL referred to someone named "Michael" who "sent me a bag full of jingles … And then I work it off. I keep selling him fish, keep deducting, deducting, deducting until it disappears. From $668,000 to zero. Less than six months."

20. RAFAEL also told the UCs that "Michael" wanted to buy from RAFAEL, in cash, another million dollars' worth of fish, and made reference to Michael laundering funds for RAFAEL and others. RAFAEL said, "He [Michael] buys a lot of fish. You can become a laundromat. You'll never find a better laundromat than this motherfucker." RAFAEL then said, "I could have to regret this to you [sic], because I don't know you. You could be the IRS in here. This could be a cluster-fuck. So I'm trusting you. The only thing is, I open myself because both of you is Russians and I don't think they would have two Russians [posing as agents]. Fuck me – that would be some bad luck!"

21. On June 18, 2015, RAFAEL again met the UCs at his office to continue negotiating a price for RAFAEL's business. When asked to describe his off-the-books fish sales in greater detail, RAFAEL discussed how he falsifies reports to disguise his underreported fishing activity. RAFAEL said that every Friday or Saturday, he works with an employee, later identified as DEBRA MESSIER, who is responsible for preparing the reports. If RAFAEL's

6

boats catch fish in excess of legal quotas, he tells MESSIER to change the description on the report to that of another species for which he had remaining quota, or to one for which there were no limitations at all.

22. RAFAEL told the UCs that Michael delivers cash to RAFAEL in advance of fish shipments. RAFAEL then sends fish to Michael, in New York, in varying increments over a six month period until the advanced payment is worked off. RAFAEL sends the fish to Michael by truck, after which RAFAEL marks a journal detailing the value of the fish shipped. RAFAEL reduces the balance owed to Michael after each shipment until the cash advance is fully repaid.

### B.       RAFAEL's Efforts to Launder and Conceal Proceeds from Illegal Fish Sales

23. On October 14, 2015, the UCs met with RAFAEL a third time, at a restaurant in Mattapoisett, Massachusetts. During the meeting, RAFAEL continued to describe his methods for falsifying reports and avoiding scrutiny by NOAA observers. The UCs pressed RAFAEL for proof of his unreported cash income from off-the-books fish sales. RAFAEL told the UCs that he smuggles the cash to Portugal, where he deposits it into Portuguese banks. RAFAEL also said he has avoided completing any forms at the foreign banks that would disclose his U.S. citizenship (to avoid any reporting to the U.S. Internal Revenue Service). RAFAEL said he receives a lower interest rate or no interest at all on his accounts because he has not completed the forms.

24. RAFAEL described purchases he has made in Portugal with funds he allegedly smuggled to that country. He spent $250,000 to "fix up" his parent's home, $135,000 on his own home, $100,000 to purchase a warehouse and another $100,000 on a pleasure boat.

25. In a follow-up call the following week, on October 20, 2015, RAFAEL told one of the UCs that he had just received a cash payment from Michael – a duffel bag containing

$625,000. Of that amount, RAFAEL said he would be taking $100,000 with him when he flew to Portugal on November 10, 2015 (RAFAEL later changed the amount, however, to $20,000 and $30,000). RAFAEL explained that he smuggles the cash through the airport with the help of a local law enforcement officer, who meets RAFAEL beforehand, takes the cash, circumvents airport security by moving through restricted areas, and then meets RAFAEL in the terminal to return the money. (That way RAFAEL can avoid having to report transporting more than $10,000 in cash out of the country.) RAFAEL estimated carrying between $40,000 and $60,000 per trip in this manner. RAFAEL also told the UCs that he expected his next cash delivery from Michael in April or May 2016.

26. On November 10, 2015, RAFAEL tried to bring a large amount of cash through security at Logan International Airport without complying with reporting requirements. At about 9:28 pm that day, RAFAEL entered the Transportation Security Administration ("TSA") passenger screening area carrying a briefcase. During the screening process, TSA personnel discovered that RAFAEL was carrying over $10,000 U.S. currency in his briefcase. Two TSA agents escorted RAFAEL to a Customs and Border Protection ("CBP") window so he could declare the currency. RAFAEL completed a FinCEN Form 105, Report of International Transportation of Currency or Monetary Instruments, upon which he declared that he was taking $27,000 in U.S. currency to Portugal. During this process RAFAEL was asked about the money he was carrying. He confirmed that he was bringing the cash to Portugal. RAFAEL, however, insisted that he did not have bank accounts in that country.

27. RAFAEL was then escorted through screening by TSA agents and directed to the jet bridge to his flight. As he approached the jet bridge, RAFAEL was stopped by two CBP

officers who conducted a secondary search of RAFAEL and his briefcase. One CBP officer counted the currency in RAFAEL'S briefcase and determined it to be $26,407.

### C. "Michael" Confirms the Arrangement with RAFAEL and his Availability to Launder Funds

28. In light of RAFAEL telling the UCs that Michael buys substantial amounts of RAFAEL's illegally-caught fish and is able to launder funds, the UCs asked RAFAEL for an introduction to him. RAFAEL eventually agreed. On January 13, 2016, RAFAEL gave the UCs a telephone number so they could contact Michael directly. The UCs called him and arranged for a meeting in Manhattan, New York on January 20, 2016.

29. On January 20, 2016, the UCs met Michael at a restaurant in New York City. During the meeting, Michael referred to RAFAEL as his "best friend" and confirmed that he brought bags of cash to RAFAEL in Massachusetts in exchange for fish. Michael, echoing RAFAEL's explanation, said that he pays up front for the fish in cash, after which RAFAEL ships installments of fish to Michael in New York until Michael has received an amount worth the amount Michael fronted RAFAEL, plus 10%.

30. Michael told the UCs he uses Quickbooks for his commercial fish business, but that it does not reflect his purchases from RAFAEL. As to his business with RAFAEL, Michael said, "Yeah, that doesn't exist. Yeah, on the other side, I have a book that I just keep and we [that is, Michael and RAFAEL] go over it every day with the purchases so there's no arguments at the . . . how much is owed and stuff. Nothing exists. There's no paper. There's no trail. I just got a book that says $668,000 and every day I deduct what he sent me. That's it."

31. During the meeting the UCs also told PERRETTI that they had cash on hand from an insurance fraud they had perpetrated. PERRETTI explained that he could launder money for the UCs, suggesting he could reach out to the individuals he used to charge 15% to in the past.

9

The UCs confirmed, "That's something you do. It sounds like something you do," to which PERRETTI replied, "Yeah, I could do that. I can do that. I can move some of that." When asked how much cash PERRETTI could "move," PERRETTI said, "I don't know because I haven't reached out in a long time for anybody so now . . . it's always doable. I haven't reached out to anybody. Like I said, I'm only using him [RAFAEL] and the other guy in Gloucester."

        **D.**      **RAFAEL and MESSIER Show the UCs How They Falsify Dealer Reports to Evade Fishing Quotas**

        32.      After returning from the meeting with Michael in New York, the UCs arranged to meet RAFAEL again. On January 26, 2016, the UCs met with RAFAEL at his office in New Bedford. Also attending the meeting was a woman RAFAEL introduced as "Debra" (MESSIER).[1] RAFAEL told the UCs that MESSIER had "been in the life with [RAFAEL] for 30 years," and that "[e]verybody in this company knows the scheme." He later observed that MESSIER "knows it all. She's loyal."

        33.      The UCs had asked for the meeting so RAFAEL could to walk them through the records that substantiate his claims of substantial "off-the-book" fish sales to Michael in New York. RAFAEL invited MESSIER to the meeting because, as noted above, RAFAEL told the UCs that she routinely helps him manipulate his dealer reports to substitute certain species for others.

        34.      During the meeting MESSIER retrieved documents from a room adjacent to RAFAEL's individual office, bringing in stacks of paper she identified to the UCs as bills of lading documenting the fish actually shipped to Michael. She walked the UCs through the bills of lading, which memorialized the fish recipients, their locations, what specific species were

---

[1] Before the January 26, 2016, meeting, NMFS agents working on this case knew that RAFAEL employed a bookkeeper named Debra Messier. Agents retrieved a copy of Messier's Massachusetts driver's license photograph and, after the meeting, the UCs confirmed that "Debra" was the person in the license photograph.

shipped, the total weight by species, and the price per pound per species. The bills of lading also included a total dollar value for the items shipped based on the price per pound calculations.

35. At one point a UC asked, if the bills of lading were accurate as to the fish species actually shipped, how did RAFAEL keep that information from "showing up" elsewhere (and so revealing the fraud). RAFAEL replied, "Very easy, we own the boats." Based on the experience of NMFS agents working on this investigation, RAFAEL meant that, since he owns the boats from which his fish dealing business is buying the fish, he can manipulate trip and dealer reports to keep them consistent.

36. MESSIER and RAFAEL then showed the UCs the purchase invoices for activity on the same days as those memorialized in the bills of lading, noting that, instead of showing the name of the species (subject to stricter quotas) that were actually shipped to Michael and entered on the bills of lading, the invoices listed false names of species for which RAFAEL had a very high quota.

37. RAFAEL also pulled loose papers from a drawer of his desk. He separated the papers into two groups and said, "This is one load and this is the next one we are working on." The header on both of the sheets contained a reference to Michael's commercial fish company in New York, the name of which the agents had previously ascertained. When asked why the ledger was labeled with that reference, RAFAEL replied, "That's Michael. That's the name of his company." One ledger showed a start date of November 20, 2014, while the other showed dates through January 2016.

38. RAFAEL identified as his primary salesman another Carlos Seafood employee ("Employee One"). RAFAEL described how Employee One maintains a handwritten sheet of paper detailing the amounts and species of fish landed each day. According to RAFAEL,

11

Employee One marks on the sheet what the limited quota species listed there should be changed to so as not to arouse suspicion. MESSIER confirmed to the UCs that she receives these handwritten documents from Employee One and uses them to falsify the weekly dealer reports that she prepares. MESSIER said, however, that she also ensures that the bills of lading for fish shipped to Michael accurately disclose the species.

39.     Later in the meeting, RAFAEL walked into another office at Carlos Seafood, belonging to Employee One, saying, "I got to make sure I put this shit [referring to documents] on [Employee One's] desk." RAFAEL pointed to a document in the office and said, "This is the shit we painted all week. See? Seven hundred dabs [a kind of fish], 900, 925, 400, 2,000, 1,400, 2,800, 3,560. We call these haddock. This is grey sole, 1,600, 1,200, 300, 220, 395, 835." The UC asked, "Do you call that haddock too?" RAFAEL replied, "Call that haddock. So, and then he keeps – I don't know where has it because I told him, I says, he had a paper. I don't know where he has it. We'll have to ask him tomorrow. He has a paper he keeps track how many we've done so far because then, I figure, how much money I saved in not buying this quota. Because if I get 300,000 pounds of that, that's $300,000. Dabs are going for a buck a pound."[2]

40.     RAFAEL said the bills of lading match every entry on his cash sales ledger. When asked by the UCs specifically how he prevents accurate records of fish from being

---

[2] Based on discussions with NMFS agents, when Rafael referred to the money he saved by not buying quota, he is referring to buying quota from another sector. NOAA allows sectors to buy additional quota from other sectors if they are running low on a particular species. Here, it appears that quota for dabs was being sold among sectors for $1.00 a pound. Rafael is telling the UCs that, by renaming the dabs his vessel actually landed as haddock – a species for which he has millions of pounds of quota – he saves $1.00 a pound he would have had to spend for additional dab quota from another sector.

reported after they are weighed at the auction house,[3] RAFAEL replied, "We call them something else. It's simple. We've been doing it for over thirty years." He continued,

> You will never get away with all the fish. What I'm saying is without the Feds being there or the green police[4] being there. But since we got a lot of fish, we don't have a problem reporting what we got. The thing is, when the guy [the dockside inspector] disappears, that's when we got a chance to make that fish disappear and that fish disappears under a different name. Becomes one of the names where we have a lot of quota, that doesn't make a difference. I can call them haddock. This year I'll have 15 million pounds [of quota] of haddock. So I can call any son of a bitch haddock if the bastards are not there. I rename them. Even when they're there, I disappear them. I could never catch 15 million. It's impossible."

41.    RAFAEL referred to the handwritten notes Employee One drafts for MESSIER as "the dance." MESSIER showed an example of Employee One's notes to the UCs. RAFAEL said, "That's the dance. The dance the guy does, the salesman, [Employee One]. You will see this [pointing to the handwritten notes] match that [pointing to the cash ledger labeled with Michael's business in New York].

42.    MESSIER then pointed out certain items on Employee One's notes saying, "This is all the species of fish that we got at the auction and what happens is, for instance . . . 120 pounds of the large haddock that he listed on here, [Employee One] lets me know what he sold it as because I'm going to have a discrepancy when I tie out my weights and species." To which RAFAEL added, "It never balances, the weights. She has to make it disappear. She has to tie it out from one end to the other so the shit ties in."

---

[3] The Auction (Whaling City Display Auction) is a federally permitted seafood dealer that offloads fish directly from fishing vessels and immediately weighs and records the catch by species. The offloaded and weighed fish is then sold via auction to the highest bidder.

[4] RAFAEL appears to be referring to the Massachusetts Department of Marine Fisheries officers who are periodically present during the unloading of commercial fishing vessels. One of the Fishery Officers duties is to ensure the proper accounting for and reporting of fish landed by commercial fishermen.

43. RAFAEL and MESSIER went on to show the UCs specific examples from recent catches and shipments of fish. RAFAEL and MESSIER showed the UCs an invoice, dated January 25, 2016, for fish Carlos Seafood purchased from the fishing vessel ("FV") Hera II. The invoice listed "large haddock," at $2.75/pound, totaling $12,086.25, and "scrod haddock," at $1.40/pound, totaling $280. RAFAEL said, "Right here, here they are. Fuck that, 4,395 pounds of large haddock. Haddock today was only $1.52 in the auction. That's $2.75, that's sea dabs. That fish there, that's dabs. This scrod haddock is small dabs."

44. That is, RAFAEL told the UCs that the "haddock" entries on the invoice were actually dabs and that the "scrod haddock" entries were small dabs (dabs being another species of fish subject to stricter quotas). Doing the math, $12,086.25 worth of haddock, at $2.75/pound, is 4395 pounds – the figure RAFAEL noted above – and $280 worth of scrod haddock, at $1.40/pound, is 200 pounds, for a total of 4595 pounds of fish. As to the price per pound listed on the invoice, RAFAEL indicated that the price was a tip-off: haddock was only selling at $1.52/pound the day the catch came in, but the invoice listed $2.75/pound, which was actually a price more in line with what dabs were selling for.[5] RAFAEL went on to explain that he never buys haddock in the course of his business dealings.[6]

---

[5] A review of the Whaling City Display Auction dealer reports for that day showed the purchase price for dabs at $2.61/lb, a slightly lower price.

[6] "Yeah, that's all dabs there. Because we didn't buy a pound of haddock. You ain't gonna find a pound of haddock on sales in this company because very seldom we buy, we buy scrod haddock; haddock we never do."

I note that the Carlos Seafood invoice for fish bought from the FV Hera II also listed small and medium dabs (in addition to the "haddock" that was also really dabs). The small and medium dabs were listed at $2.30/pound, for a total of $851 (small), and $2.50/pound, for a total of $1,175 (medium). Doing the math, the invoice reflects 840 pounds of declared dabs. That amount roughly matches the trip report filed by the FV Hera II for January 25, 2016 (which reported 800 pounds of dabs – a figure I am informed is within acceptable estimates) and exactly matches the subsequently filed dealer report. In short, on January 25, 2016, RAFAEL caught 840 pounds of dabs that he chose to accurately memorialize as dabs,

14

45. RAFAEL and MESSIER also showed the UCs a bill of lading, dated January 25, 2016, for a shipment of fish from Carlos Seafood to Michael's company in New York. RAFAEL told the UCs that he ships fish to Michael "every day unless there's no boats," and that the shipping is done by truck to New York using a local freight forwarding business. RAFAEL confirmed that all of his off-the-books cash sales go to Michael in New York, as opposed to other buyers.[7]

46. The bill of lading showed the sale of 360 pounds of dabs to Michael, for $3.15/pound. Gesturing at the paperwork, MESSIER said, "Purchased as haddock, so $2.75 [referring to Carlos Seafood's invoice for purchasing the catch from the FV Hera II, which falsely listed "haddock," at $2.75/pound], we sold them for $3.15 [referring to the price listed on the bill of lading for Carlos Seafood's shipment, which listed "dabs" going to Michael].

47. The week following the UCs meeting with RAFAEL and MESSIER, NMFS agents retrieved the dealer report Carlos Seafood filed for fishing activity during the week of January 25-29, 2016. As noted above, dealer reports are electronic reports detailing information about the fish dealers buy, often from incoming vessels. To submit these reports, the dealer logs onto a NOAA website and enters the data. Dealer reports include data about the date a catch was landed, the name of the vessel that brought it in, the grade, species, price and weight of the fish, and the number of the trip report that corresponds to a particular catch.

48. A review of the SAFIS system, that is, the online system maintained by NOAA into which dealers enter dealer report data, shows that on Friday, January 29, 2016, the system

---

and so the trip report reflects 800 pounds, Carlos Seafood's invoice for what it bought from the boat reflects it, as does the dealer report filed later in the week.

[7] UC: "Wait, do the other guys do cash too, or just Michael?" RAFAEL: "No, no, no, no." UC: "No, no, no, okay, that's what I thought." RAFAEL: "Michael is the only one."

was accessed using the username and password assigned to Carlos Seafood. The system also shows that Carlos Seafood's dealer report for the week of January 25-29, 2016, was entered that same day, between about 5:02 pm and 5:07 pm. Footage from a pole camera positioned near Carlos Seafood shows MESSIER arriving at Carlos Seafood at 12:45 pm on January 29, 2016, and leaving in the evening at a time after 5:07 pm.

49. The dealer report included the catch landed by the FV Hera II on January 25, 2016, and listed the Hera II as landing (and Carlos Seafood as buying from that boat) 4595 pounds of "haddock." As noted above, the fish on the Carlos Seafood invoice for that day – falsely listed as "haddock" but really dabs – weighed a total of 4595 pounds, precisely the amount listed as "haddock" in the dealer report. In short, the dealer report entry of 4595 pounds of haddock is false – it is the fish RAFAEL admitted to the UCs was really dabs, a different fish subject to stricter quotas.

50. The Carlos Seafood invoice also listed, at the top of the page, the number of the trip report filed by the captain of the FV Hera II when he landed its catch on January 25, 2016. Following the meeting with RAFAEL, NMFS agents pulled that trip report. It lists the FV Hera II as bringing into port a total of 8200 pounds of haddock. The report, which is handwritten, first lists 4200 pounds of haddock, then contains three other entries before listing another 4000 pounds of that fish. The first 4200 pound entry is listed as being sold to the fish auction house in New Bedford. The second entry is listed as being sold to Carlos Seafood. During the meeting, RAFAEL had told the UCs that Carlos Seafood itself never buys haddock, but that RAFAEL has no problem selling it to other dealers at the dock.

51. Based on the UCs' meeting with RAFAEL, the second "haddock" entry in the trip report is false; it is in fact cover for the dabs the FV Hera II caught that day but that RAFAEL

wanted to hide. As noted above, because all dealer reports include the serial number for the corresponding trip reports, government authorities can compare the reports as a check on fraud. But, if one person owns both the vessel and the dealer buying the catch, that person can make sure the reports match up. As RAFAEL told the UCs during the meeting, "the captains know" that RAFAEL misrepresents the species caught on trip and dealer reports, and stand to profit from the fraud. RAFAEL also told the UCs that he knows when his boats are coming in and exactly what is on them:

> Yeah, the captain reports to me. The captain says I'll be in, and I ask him what do you got? . . . He says I got dabs, I got pollock, I got this and I got that, and then I call Michael and I say what are you looking for tomorrow[?]

52. One of the UCs later asked, "So when you pay the boats, do you pay them as haddock?" RAFAEL replied, "I pay them as haddock, but it's not haddock."

## **CONCLUSION**

53. Based on the foregoing, I submit that there is probable cause to believe that

   a. On or about January 29, 2016, and on other occasions, RAFAEL and MESSIER knowingly made false entries in records (dealer reports), with the intention to impede and influence the investigation and proper administration of matters within the jurisdiction of NOAA and other agencies of the federal government, and aided and abetted that offense, in violation of 18 U.S.C. §§ 1519 & 2;

b. Starting at an unknown date and continuing through the present, RAFAEL and MESSIER have conspired to commit the above offense, in violation of 18 U.S.C. § 371.

I declare that the foregoing is true and correct.

Ronald Mullett
Special Agent
U.S. Internal Revenue Service

Subscribed and sworn to before me this 24th day of February, 2016.

HON. DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS